UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CSX TRANSPORTATION, INC.,

             Plaintiff,

v.                                                    Case No. 3:05-CV-1271-J-32MCR

PROFESSIONAL TRANSPORTATION, INC.,

             Defendant.

---

**RESPONSIVE MEMORANDUM OF CSX TRANSPORTATION, INC.
TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

      Plaintiff, CSX Transportation, Inc. ("CSX"), in accordance with Local Rule 3.01(c) and

the Court's Order of September 13, 2006 (Doc. 43), submits the following Responsive

Memorandum (CSX's "Reply") to Defendant, Professional Transportation, Inc.'s (PTI)

Memorandum in Opposition to CSX's Motion for Summary Judgment (Doc. 39) (PTI's

"Opposition").[1]

### Introduction

      In its Opposition, PTI did not put forth any evidence to create a genuine issue for trial or

support a judgment in its favor.  Further, PTI did not offer a reasonable interpretation of the

Agreement that would justify or support the admission of parol evidence or otherwise render this

matter inappropriate for summary judgment.  Even if parol evidence was admissible, as opposed

---

[1] In this Reply, CSX will only address arguments PTI raises in Section II (relating to ambiguity) of its
Opposition. CSX rests on the current briefing of the parties with respect to its arguments that PTI's
Counterclaim is based upon an unenforceable agreement to agree and no remedy exists for the "breach" of
such a provision (CSX's Motion for Summary Judgment, Section III, pp. 17-20), that no evidence exists
that CSX breached Section 10(D), and that PTI has waived any rights it may have had under Section
10(D) (CSX's Motion for Summary Judgment, Section VI, pp. 22-25.),

to explaining or clarifying ambiguous terms, PTI's parol evidence directly contradicts the Agreement itself and would nullify certain key provisions.

## ARGUMENT

### I.    PTI Has Not Created a Genuine Issue Regarding the Interpretation of the Agreement.

In response to CSX's argument that the Agreement is unambiguous, PTI contends that the "plain language" of Section 10(D) is "clear" but, despite this admitted clarity, an ambiguity still exists because "the parties have interpreted such language differently." Opposition, 2. PTI also claims that the Agreement is reasonably susceptible to differing interpretations – due exclusively to the fact that the parties differ in their interpretations – although PTI neither offers a reasonable interpretation nor provides a credible explanation of how any of the terms are ambiguous.[2]

### A.    An Agreement is Not Ambiguous Merely Because Parties Interpret it Differently.

Apparently conceding that "the plain language of Section 10(D) is clear," PTI nevertheless contends that there are "ambiguities" within Section 10(D) "which the parties have interpreted differently." Opposition, 6. PTI then contends that a "genuine issue of material fact exists" when the language of a contract is ambiguous "because the parties have given the language differing interpretations." Opposition, 7. In other words, PTI appears to argue that merely because CSX and PTI differ in their respective interpretation of certain language found in

---

[2] CSX contends that the liability and indemnification provisions contained in Section 10 of the Agreement are unambiguous and that PTI's position regarding Section 10(D) contradicts these sections which another federal court has already found to be unambiguous. See CSX's Motion for Summary Judgment, p. 10 and Exhibit D. PTI tries to obscure this point by claiming that the Agreement at issue in Williams et al. v. CSX Transportation, Inc. was not the Agreement at issue in this case. Opposition, 9, fn 17. PTI is wrong, and there is an extensive record in Williams to illustrate this. Attached hereto as Exhibit A is the affidavit of Robert Tevault submitted in Williams (Mr. Tevault also served as PTI's 30(b)(6) designate in this case), indicating that the Agreement at issue in Williams is the System Agreement of June 28, 2002, which is the *identical agreement* at issue in the present case.

the Agreement, theses differing interpretations, standing alone, establish ambiguity for the purpose of admitting parol evidence and defeating summary judgment. This is not the law.

"The fact that both sides ascribe different meanings to the language does not mean the language is ambiguous so as to allow the admission of extrinsic evidence." Kipp v. Kipp, 844 So. 2d 691, 693 (Fla. 4th DCA 2003); See also Lambert v. Berkley S. Condo. Ass'n, 680 So. 2d 588, 590 (Fla. 4th DCA 1996) (holding that a true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner).

> A true ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible. It is the duty of the trial court to prevent such interpretations.

American Med. Intern., Inc. v. Scheller, 462 So. 2d 1, 7 (Fla. 4th DCA 1984).

The present matter is similar to Kipp, a case PTI does not discuss but which raises the identical principles of contract interpretation included in the cases PTI cites. In that case, a settlement agreement involving a marriage dissolution provided that the husband agreed to pay his former wife an additional sum of "up to" $2 million at the time the wife closed on any subsequent parcel of real estate which is used for the primary residence of the children. See 844 So. 2d 692-93. Soon after dissolution, the wife purchased a house and the husband paid her $970,000. See id. at 692. The wife claimed that she was entitled to an additional $1,030,000. See id. The trial court concluded that the former husband was obligated to pay the former wife a total of $2 million with respect to the purchase of the residence, regardless of the amount actually paid by the former wife to purchase the residence. See id.

The appellate court reversed, finding that the plain meaning of the phrase "up to" leads to the "inescapable conclusion that the phrase set a cap but not the amount" the former husband would have to pay for the cost of the house to be purchased by the former wife. See 844 So. 2d

at 693-94.  Beyond the obvious language used in the agreement, the court also recognized that

the wife's alternative position would contradict or negate other provisions of the agreement.  <u>See</u>

<u>id</u>.  Specifically, the court noted that if the parties had intended for the husband to make a

straight $2 million award, then the operative section would have been written like the other

provisions of the agreement where the husband had, in fact, agreed to make specific financial

payments.  <u>See id.</u> at 693.  In ruling for the husband, the court recognized that parol evidence in

the form of the wife's testimony discussing "her intent" that she was entitled to the entire $2

million "was not admissible where terms of a contract are complete and unambiguous."  <u>Id.</u> at

694.

Much like the wife in <u>Kipp</u>, PTI suggests an interpretation of Section 10(D) that not only

conflicts with the language of Section 10(D) but also contradicts other provisions of the

Agreement.  In addition, PTI purports to offer self-serving parol evidence just like the wife in

<u>Kipp</u> who offered testimony of her intent that conflicted with the express terms of the

Agreement.  Here, remarkably, that self-serving testimony comes in the form of an affidavit from

Paul J. Wallace (Opposition, Exhibit F), PTI's lead counsel in this case.  Here, Mr. Wallace

interjects himself into the merits of the case by offering "evidence" of the negotiations and PTI's

intent, even where that intent conflicts with the written terms of the Agreement.  Notably, and

despite Mr. Wallace's first hand knowledge of the negotiation of key provisions of the

Agreement, PTI's apparent intent as expressed in Paragraph 9 of his affidavit is not in the

Agreement.  The Agreement simply does not say that CSX agreed to share in PTI's insurance

costs; in fact, the Agreement provides that PTI was solely responsible for insurance costs.

Similarly, the Agreement contains no reference to a "base term," as mentioned in Paragraph 10

of the affidavit.  Finally, any "discussion" that may or may not have occurred, as referenced in

Paragraphs 10 and 11 of Mr. Wallace's affidavit were merged into the final, integrated

Agreement. Agreement, Section 21(G).

Strama v. Union Fidelity Life Ins. Co., 793 So. 2d 1129 (Fla. 1st DCA 2001), a case PTI

relies upon, does not stand for the proposition asserted by PTI that a "genuine issue of material

fact exists" when the language of a contract is ambiguous "because the parties have given the

language differing interpretations." Opposition, 7. Differing interpretations alone do not create

an ambiguity. Kipp v. Kipp, 844 So. 2d at 693. In Strama, the court found that the terms of the

contract at issue were "reasonably susceptible to more than one construction." 793 So. 2d 1129,

1132. In short, application of the term "totally disabled" as used in an insurance contract could

lead to different results to the extent the term was construed one way under the workers'

compensation laws and another way when interpreted based upon the definitions contained

within the contract itself. See id.

Here, CSX and PTI interpret the Agreement differently, but those differences do not

create ambiguity in the legal sense for purposes of admitting extrinsic evidence. As the court

observed in Scheller, "fanciful, inconsistent, and absurd interpretations of plain language are

always possible." 462 So. 2d at 7. Indeed, PTI demonstrates that here. PTI's interpretation of

the Agreement (based upon the parol evidence it would introduce) would, essentially, shift

claims and insurance costs to CSX, which PTI expressly agreed to bear, and compensate PTI in

the form of a surcharge, over and beyond the compensation it has already earned under the

Agreement, as opposed to modifying the Agreement to make insurance available to PTI, or allow

it to do so at a lesser amount. Having apparently faced significant uninsured losses which it did

not anticipate when it agreed to the terms of the Agreement in 2002, PTI's interpretation of

Section 10(D) represents nothing more than post-agreement wishful thinking. This court should

reject PTI's efforts to re-write the Agreement under the guise of claiming that the Agreement is "ambiguous" as the legal mechanism for PTI to use parol evidence to support its claim that the Agreement does not mean what it says.

**B.      PTI's Interpretation of the Agreement is Not Reasonable.**

Alternatively, PTI argues that a genuine dispute exists because Section 10(D) is "reasonably susceptible" to different interpretations "as evidenced by PTI and CSX's own interpretations of this section." Opposition, 1, 13. PTI accurately cites Florida cases for the accepted proposition that a basis exists for admitting parol evidence where the contract is reasonably susceptible to more than one construction. PTI, however, does not offer a reasonable interpretation of the Agreement. Moreover, PTI provides no explanation of how the current language fails to specify the rights and duties of the parties, or how the Agreement lacks sufficient insight into the intent of the parties, which are key indicators of contractual ambiguity. See Crown Mgmt. Corp. v. Goodman, 452 So. 2d 49, 52 (Fla. 2d DCA 1984); Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So. 2d 1000, 1002 (Fla. 1st DCA 1995).

**1.      PTI does not offer a credible interpretation of "renewal premium."**

PTI argues that "renewal premium" is ambiguous but spends most of its time focusing exclusively on the concept of "premium". At no point in its Opposition does PTI establish or even attempt to argue that the term "renewal premium" is, in fact, ambiguous and seems to ignore the fact that "premium" is modified and therefore limited by the word "renewal." Like "premium," Florida law defines "renewal" as the "issuance and delivery by an insurer of a policy superseding at the end of the policy period previously issued and delivered by the same insurer, or the issuance and delivery of a certificate or notice extending the term of a policy beyond its policy period or term." FLA. STAT. § 627.728. Subsequently, when the term "renewal" modifies

"premium" courts have found that "renewal premium" is not ambiguous.  See Allstate Indem.
Co. v. Mohan, 764 So. 2d 901, 903 (Fla. 5th DCA 2000) (the plain meaning of "renewal
premium" is commonly understood to refer to a fixed amount of money to procure an insurance
policy).

Focusing solely on "premium", PTI essentially contends that the term is ambiguous
because the parties interpret it differently and Florida law broadly defines "premium" to include
"the consideration for insurance, by whatever name called."  According to PTI's highly
conclusory and unsupported assertions, this includes every dollar PTI ever sent to a broker, even
where these funds were used to satisfy deductibles and other uninsured losses which were PTI's
responsibility under the Agreement (and administered on PTI's behalf by a third party associated
with PTI's insurance carrier), and even when these amounts were forwarded to the broker during
"subsequent policy terms." Opposition, 11.  PTI's position is inherently contradictory.  PTI
contends, on the one hand, that a premium "is the consideration given in exchange for the
insurer's undertaking to provide insurance coverage to the insured" (Opposition, 11, *citing* Couch
on Insurance 2d, § 30:2 (2004)).  PTI then contends, on the other hand, that "renewal premium"
refers to the aggregate sum of money paid in consideration for insurance coverage "during
subsequent policy terms." Opposition, 11.  There is no way that sums PTI paid to its broker or
insurer "during subsequent policy terms" constitute "renewal premiums" for earlier policies that
had presumably expired.  For example, PTI has not, and cannot, create a genuine issue for trial
by arguing that amounts paid to its broker or insurer in 2004, for example, constitute a "renewal
premium" for policies procured and effective as of April 1, 2003.[3]

---

[3] PTI offers Exhibit C of its Opposition as "evidence" that the insurance carrier considered all of the costs
of insurance as the "premium."  The document, however, lists a number of categories of estimated costs
for PTI's auto and workers' compensation insurance programs and clearly differentiates premiums from
other cost categories, especially amounts to be paid to a third party to administer claims.  While all of this

## 2.    PTI's interpretation of "immediately preceding policy term" contradicts the plain language of the Agreement.

PTI's interpretation of "immediately preceding policy term" is directly contrary to the words of the Agreement itself.  PTI's interpretation, as noted in its Opposition at 10, is that this phrase refers to a "base policy term" in effect at the outset of the Agreement – the one that "precedes" the present term – or refers to the policy of insurance "immediately preceding" the term of the Agreement (Opposition, 5).  This may be true if the Agreement were written differently, such as, if the operative provision of Section 10(D) stated instead ". . . in the event that the renewal premium for such insurance is at least seventeen and one-half percent (17.5%) greater than the premium *for the last full policy term that immediately preceded the term of this Agreement.*"  The Agreement, however, does not say this.  Instead, it refers to comparing the renewal premium to the premium for the immediately preceding "*policy term*" (emphasis added) clearly indicating that, in the full context of the section, "immediately preceding" refers to the policy term, *not* the policy of insurance that preceded the actual term of the Agreement.

Other authority PTI cites includes settled principles of Florida law governing contract interpretation, none of which are applicable to this case.  For example, PTI cites <u>Hancock, et al. v. Brumer, Cohen, Logan, Kandell & Kaufman</u>, 580 So. 2d 782 (Fla. 3d DCA 1991), for the proposition that language in a contract is ambiguous if it is reasonably susceptible to two different interpretations.  In finding that disputed contract provision was reasonably susceptible to more than one construction, the court relied heavily on the fact that, as between the parties involved – a law firm and a lay client – that a laypersons construction of the term was given significant weight.  <u>See</u> 580 So. 2d at 784 ("[V]iewing the contract in the light most favorable to the [lay clients], the disputed contract provision was reasonably susceptible to more than one

---

is listed under a label called "Program Premium Schedule," the labels alone do not create a genuine issue that PTI's broker deemed all such payments as "premiums."

construction, *particularly in the mind of laypersons*, such as the [plaintiffs]"). Here, both CSX and PTI are sophisticated parties – in fact, PTI's counsel has offered his own first hand testimony regarding the negotiations – who were ably represented by counsel in the negotiations for the Agreement such that the considerations set forth in <u>Hancock</u> are not applicable.

### 3.   PTI's parol evidence would change the Agreement, not explain it.

In <u>Gorman v. Kelly</u>, 658 So. 2d 1049, 1052 (Fla. 4th DCA 1995), a case cited by PTI, the court noted that extrinsic evidence may be admitted to explain, clarify or elucidate the ambiguous language, not to vary the terms of the contract.  Even if the Agreement were found to be ambiguous, the extrinsic evidence PTI purports to offer would have the effect of creating new terms out of whole cloth which, if accepted, would contradict the terms of the Agreement.  For example, PTI contends on two occasions that Section 10(D) was included to modify the insurance requirements "and to provide financial protection and reimbursement to PTI." Opposition, 4, 19.  The Agreement does not say anything about paying reimbursement of any kind to PTI and would vary the terms of the Agreement that provide no such payments to PTI.

When considering all of the provisions of the Agreement, it is obvious that PTI's construction would lead to absurd conclusions, which should be rejected in favor of CSX's view which is consistent with reason and probability.  <u>Paddock v. Bay Concrete Indus., Inc.</u>, 154 So. 2d 313, 316 (Fla. 2d DCA 1963).  PTI's construction – which would shift claims and insurance costs to CSX in direct contradiction to the terms of the Agreement – is "weighty evidence" that the "inconvenience, hardship or absurdity" of its position was not intended, as opposed to CSX's position, which is neither absurd nor frivolous and is consistent with the general purpose pf the parties.  <u>James v. Gulf Life Ins. Co.</u>, 66 So. 2d 62, 63 (Fla. 1953).

Respectfully submitted,

s/Michael A. Abel _____
Michael A. Abel, Esquire
Florida Bar No. 0075078
Albert C. Chin, Esquire
Florida Bar No. 0602701
Holland & Knight LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
(904) 353-2000
(904) 358-1872 (Facsimile)
Email: michael.abel@hklaw.com
        albert.chin@hklaw.com
Attorneys for CSX Transportation, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Robert B. George, Esquire
Rutledge R. Liles, Esquire
LILES, GAVIN, COSTANT1NO & GEORGE
225 Water Street, Suite 1500
Jacksonville, Florida 32202
Email:  rgeorge@lgcglaw.com

I hereby certify that on September 25, 2006, I sent a notice of the foregoing by electronic mail to the following:

Paul J. Wallace, Esquire
BOWERS HARRISON, LLP
25 N. W. Riverside Drive, 2nd Floor
Evansville, Indiana 47708
Email:  pjw@bowersharrison.com

s/ Michael A. Abel _____
Attorney for CSX Transportation, Inc.

# 4067422_v1

10

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### EVANSVILLE DIVISION

GEORGE E. WILLIAMS
and DAWN WILLIAMS,
MARK A. SIMPSON
and CINDY SIMPSON,

       Plaintiffs,

           vs.

CSX TRANSPORTATION, INC., a corporation;
YELLOW CHECKER LIVERY, LTD., a corporation
d/b/a YELLOW CHECKER CAB CO.;
and JOHNATHAN C. WILLIAMS.

       Defendants.

Cause No.: 3:04-cv-0147
(Cause No. 3:04-cv-0148 consolidated
with this cause on October 8, 2004)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CSX TRANSPORTATION, INC.,

       Cross-Claimant,

           vs.

YELLOW CHECKER LIVERY, LTD., a corporation
d/b/a YELLOW CHECKER CAB CO.,

       Cross-Claim Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CSX TRANSPORTATION, INC.

       Third Party Plaintiff,

           vs.

PROFESSIONAL TRANSPORTATION, INC.,

       Third Party Defendant.

## AFFIDAVIT OF BOB TEVAULT

Comes now your affiant and being duly sworn states as follows:



PLAINTIFF'S
EXHIBIT

Tevault #-2
7/11/06

**EXHIBIT**

B

F I N E  &  H A T F I E L D
A Professional Corporation
520 N.W. SECOND STREET
P.O. BOX 779
EVANSVILLE, INDIANA 47705-0779

1      .I am over the age of eighteen (18) and I believe I am competent to testify based on my personal knowledge as to the matters asserted herein.

2.     I am the Vice-President of Professional Transportation, Inc. (hereinafter "PTI") and I held that same position during the time frame that includes the negotiations for the Transportation System Agreement (hereinafter "Agreement") with CSX Transportation, Inc. (hereinafter "CSXT") dated June 28, 2002 and which was referenced in the third-party complaints filed by CSXT against PTI and at the time of the events that are the subject of the plaintiffs' complaints.

3.     Yellow Checker Livery, LTD, a corporation d/b/a Yellow Checker Cab Co., an independent third party corporation transportation service provider and is not in any way related to PTI.

4.     Among the terms to be negotiated were the conditions under which CSXT was to be indemnified by PTI. As is demonstrated by one of the drafts for the Agreement, dated June 1, 2002, one of the circumstances under which CSXT sought to have PTI indemnify CSXT involved injury to CSXT employees that was due to the negligence of any Independent Provider retained or employed by PTI. A true and accurate copy of the above referenced draft is attached hereto as Exhibit A to this affidavit.

5.     PTI objected to the request that it indemnify CSXT for the negligence of any independent provider such as Yellow Checker and that provision was deleted from the final contract language

6.     The final version of the Agreement dated June 28, 2002 and signed by both CSXT and PTI contains no provision for PTI to indemnify CSXT for the negligence of any independent provider and it was never PTI's intent to provide any such indemnification.


       Further the affiant sayeth not.

I affirm under the penalties for perjury that the foregoing representations are correct to the best of my knowledge and belief.

Bob Tevault, Vice President, PTI

FINE & HATFIELD
A Professional Corporation
520 N.W. SECOND STREET
P.O. BOX 779
EVANSVILLE, INDIANA 47705-0779