**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CSX TRANSPORTATION, INC.

        Plaintiff,

vs.                              Case No. 3:05-cv-1271-J-32MCR

PROFESSIONAL TRANSPORTATION, INC.,

        Defendant.

_____

**<u>ORDER</u>**

       This case is before the Court on Plaintiff CSX Transportation, Inc.'s ("CSX")

Motion for Summary Judgment and Memorandum of Law in Support (Doc. 36).

Defendant Professional Transportation, Inc. ("PTI") filed a response (Doc. 39); shortly

thereafter, CSX filed a reply memorandum (Doc. 44). The Court heard oral argument

on October 20, 2006.

**I.    BACKGROUND**

       This is a case concerning the construction of a contract -- specifically, the CSX

Transportation System Agreement (the "Agreement") -- entered into by the parties

and made effective as of June 1, 2002. CSX, a Class 1 railroad, provides freight rail

transportation services throughout the United States and Canada. It requires the

services of contracted vendors to shuttle its train crews to various locations. In early

2002, CSX issued requests for proposals to companies that provide transportation

services to railroads. PTI, an Indiana based company which arranges and provides

crew transportation services, submitted a proposal.    After several months of negotiations, CSX and PTI entered into the Agreement.

The Agreement, which bound the parties for two years and expired on June 30, 2004, governed motor vehicle transportation services provided by PTI to CSX's train crews.  After a dispute arose between PTI and CSX concerning the construction of the last sentence in section 10(D) of the Agreement, CSX filed a declaratory judgment action in this Court seeking confirmation of its duties and obligations.  In response, PTI filed a counterclaim for breach of contract.  PTI seeks damages of approximately $4 million from CSX as compensation for CSX's refusal to negotiate in good faith, as well as CSX's failure to reimburse PTI for the costs of insurance.

### A.    Allocation of Insurance Costs and Claim Costs

Sections 10 and 11 of the Agreement allocated the parties' obligations with respect to claim and insurance costs -- the disputed costs central to this matter. Specifically, section 10 of the Agreement governed the allocation of liability arising out of the transportation services.  PTI agreed to cover all costs and claims associated with transportation services, including the duty to indemnify and defend CSX, hold CSX harmless from claims, and investigate and respond to claims, except to the extent such costs were the sole proximate cause of CSX's negligence[1] or such costs arose from "stationary vehicle" claims[2] (which the parties agreed to pay according to

---

[1]    See Section 10(B) of the Agreement (Doc. 24-3, p. 10).

[2]    See Section 10(D) of the Agreement.  (Doc. 24-3, p. 10).  CSX provided these examples of stationary vehicle claims, e.g., an incident in which a crew member

-2-

their own comparative fault).  (Doc. 24-3, pp. 9-10).

Under Section 11 of the Agreement, PTI also agreed to procure and maintain insurance at its sole cost for the entire term of the Agreement.  Id. at 11.  Specifically, PTI agreed to procure and maintain policies for Business Automobile Liability insurance and Workers' Compensation insurance.  Id.

### B.    The Insurance Policy

In 2001, before entering into the Agreement, PTI obtained a retained risk, variable premium Business Automobile Liability Policy (the "Policy") which covered negligent actions of both PTI and CSX.[3]  The Policy required PTI to pay a sum up front for estimated costs associated with servicing the account and paying claims. PTI was not required, however, to pay a fixed insurance premium.  Rather, costs under the Policy were billed by PTI's insurance broker and paid by PTI after the claims payable under the Policy were settled.  Consequently, PTI was not required to pay the costs associated with the Policy until after all claims were settled, which, depending on the applicable statutes of limitations for such claims, could take up to

---

closes the vehicle door on his finger, or a crew member slips on ice and bangs into the vehicle, and subsequently files a FELA claim against CSX.  (Doc. 36, p. 5).

[3]   Evidently, PTI had obtained a traditional fixed premium traditional policy the preceding year, but was unable to secure the same type of policy in 2001 because a single fixed premium insurance was not available to PTI to cover CSX's negligent actions.

a year or longer following the conclusion of the policy term.[4]

Both parties agree that during negotiations for the Agreement, PTI was concerned about the rising cost of insurance and before entering into the Agreement PTI and CSX engaged in discussions concerning such costs. These discussions led to the inclusion of a provision relating to insurance costs in section 10(D) of the Agreement.

## C.    Section 10(D) and the Dispute

Section 10 (D) allocated responsibility, based on comparative fault, for costs from stationary claims; however, the last sentence of 10(D) also provided for negotiations to modify the Agreement in the event either one of two events occurred. Specifically, the last sentence of section 10(D) provides:

> In the event [PTI] is unable to obtain or renew the insurance required pursuant to section 11 of this Agreement without modification of this section 10(D), or in the event that the renewal premium for such insurance is at least seventeen and one-half percent (17.5%) greater than the premium for the immediately preceding policy term, [CSX] and [PTI] agree to negotiate in good faith concerning such modification.

(Doc. 24-3, pp. 10-11) (emphasis added).[5]

---

[4]    Section 11 of the Agreement required CSX to approve the form of the insurance PTI procured.   In fact, CSX was aware PTI had procured a variable premium insurance policy, as opposed to a fixed premium policy, before entering into the Agreement.  (Doc. 39, p. 3).

[5]    During the hearing on CSX's Motion for Summary Judgment, both parties agreed this provision was improperly placed in section 10(D) of the Agreement and that it would have made more sense to place it either in section 11 -- the section relating to insurance -- or in its own separate section.

As previously mentioned, PTI had already procured the Policy before entering into the Agreement with CSX.  During the term of the Agreement, PTI renewed this Policy twice before this dispute arose; once effective as of April 1, 2003 and again effective as of April 1, 2004.  In early February 2004, PTI received a letter from its insurance broker, Acordia/CNA, notifying PTI of its total outstanding insurance costs for the Policy terms from April 1, 2001 through April 1, 2002 and April 1, 2002 through April 1, 2003.  According to Acordia/CNA, the amounts owed by PTI were as follows:

- April 1, 2001 – April 1, 2002 = $3,004,593
- April 1, 2002 – April 1, 2003 = $4,115,976

(Doc. 36-3, p. 3).  Notably, the amounts owed were costs for policy terms which began either two or three years earlier.[6]  These amounts owed included the total aggregated costs PTI incurred over these two policy years.[7]

Only several days after receiving notice of the amounts due from its insurance broker, PTI notified CSX that its insurance premiums had increased by more than 17.5%.  (Doc. 36-3, p. 2).  Accordingly, invoking section 10(D) of the Agreement, PTI sought "good faith negotiations" with CSX concerning the increase in premiums.[8]

---

[6]   At the time PTI received notice of the amounts due for these two policy terms, there were less than two months remaining before the Agreement expired.

[7]   Both PTI and its broker label these costs "premiums."  CSX argues they are incorrectly labeled and that the outstanding costs consist of all of PTI's insurance costs, including the costs of risks and claims, and such costs do not constitute consideration for obtaining the insurance policy.

[8]   PTI admits it was never unable to obtain or renew its insurance and thus, the only event it claims triggered CSX's duty to negotiate in good faith pursuant to section

-5-

Although CSX gathered information and inquired into the claim, the parties disputed whether the last sentence of section 10(D) of the Agreement was triggered and if so, what they were required to do.   After an unsuccessful attempt at voluntary mediation, this litigation ensued.

As PTI correctly states, there are two critical questions at issue in this case:  (1) was the 17.5% trigger set forth in section 10(D) of the Agreement met, and (2) if so, what were the parties obligated to do next?  (Doc. 39, p. 6).  PTI alleges the 17.5% trigger was met and CSX failed to negotiate in good faith as required by section 10(D) of the Agreement.  (Doc. 24, pp. 13-14).  PTI contends because CSX failed to negotiate in good faith, CSX should be liable for the total  increases in PTI's insurance costs -- an amount of at least $3,723,360.  Id; (Doc. 39, p. 11).[9]

CSX argues that PTI fails to offer any evidence that its renewal premiums during the term of the Agreement were 17.5% greater than the premium for the immediately preceding policy term.  (Doc. 36, pp. 13-15).  In fact, CSX argues the Coverage Form for the relevant policies demonstrates PTI's renewal premiums for the policy term beginning in April 2003 actually decreased from the April 2002 policy term. Id. at 14, n. 8.  Consequently, CSX argues the 17.5% trigger was not met and as

_____

10(D) was an increase in renewal premiums of more than 17.5%.

[9]    In its response to CSX's Motion for Summary Judgment, PTI states it is seeking damages for insurance costs over the 17.5% increase in renewal premium costs; however, during the hearing, PTI argued that CSX's failure to negotiate in good faith makes it responsible for 100% of the costs over the 2001-2002 base year insurance costs.

such, CSX was not required to enter into any negotiations. Id. at 15.

CSX also asserts the contested provision in section 10(D) is nothing more than "an agreement to agree" for which there is no specific remedy and thus, PTI's requested damages are not substantiated by the Agreement. Id. at 17-20. CSX has moved for summary judgment on both its Complaint for Declaratory Judgment and PTI's Counterclaim.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986). In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor. Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

## III.    DISCUSSION

### A.    Contract Interpretation

Ordinary principles of contract interpretation dictate that a court must consider the natural and plain meaning of a contract.    Key v. Allstate Ins. Co., 90 F.3d 1546, 1548-49 (11th Cir. 1996).    When a contract is clear and unambiguous, the Court should interpret its meaning as a matter of law and should not look to outside evidence to construe the contract.    Id. at 1549; Siedle v. National Assn. of Sec. Dealers, Inc., 248 F. Supp. 2d 1140, 1144 (M.D. Fla. 2003).    The unambiguous terms of a contract provide the best evidence of the parties' intent.    Key, 90 F.3d at 1549. In fact, when a court determines a contract is complete and unambiguous, the parol evidence rule prohibits a party from introducing any evidence which contradicts or modifies the terms of the written agreement.    Spear v. MacDonald, 67 So. 2d 630, 635 (Fla. 1953).

It is only when a court determines a contract contains an ambiguity that a question of fact arises.    Siedle, 248 F. Supp. 2d at 1144.    Upon a finding of ambiguity, parol evidence is admissible to explain or clarify the ambiguous language.    Weisfeld-Ladd v. Estate of Norman K. Ladd, 920 So. 2d 1148, 1150 (Fla. 3d DCA 2006).    Parol evidence can then be used to determine the parties' intent.    Siedle, 248 F. Supp. 2d at 1144.    It cannot, however, be used to vary the terms of the contract.    Gorman v. Kelly, 658 So. 2d 1049, 1052 (Fla. 4th DCA 1995).

### B.    The Parties' Positions

PTI contends CSX breached the Agreement by refusing to engage in good faith negotiations to determine whether to modify the Agreement and by refusing to provide financial reimbursement to PTI for the increased costs of insurance.  (Doc. 39, p. 6). CSX, however, asserts the obligation to negotiate a modification of the contract merely amounted to an agreement to agree on something in the future -- an agreement for which there is no remedy and which is thus unenforceable.  (Doc. 36, p. 17).  More specifically, CSX argues, an essential term of the contract is missing and because it was purposefully left open for future negotiation, there is no way to determine whether the parties would have reached an agreement.  Id. at 20.

PTI, on the other hand, argues the last sentence in section 10(D) is enforceable because PTI and CSX negotiated to add this section to the Agreement and obviously intended it to be enforceable.  (Doc. 39, p. 15).  PTI claims the parties intended this provision would provide protection to PTI from the increasing costs of insurance. Id. at 17.  Although, during the hearing, PTI's counsel conceded the Agreement does not specifically state CSX will reimburse PTI for increased costs above the 17.5% threshold, he argued this provision is ambiguous and does not address the parties' true intent.  Thus, PTI asserts the Court should consider parol evidence to determine the intent of the parties.

In attempting to demonstrate CSX's intent to reimburse PTI for increasing insurance costs, PTI points to an email from Shelley Mast, the CSX executive who

oversaw the crew transportation business at CSX.  (Doc. 39, p. 19).  Ms. Mast's email essentially states CSX agreed to review the Agreement and reimburse PTI for extraordinary insurance cost increases up to a certain unspecified amount.  (Doc. 39-10, p. 2).  Finally, PTI disputes there is an essential term missing from the Agreement; it contends the last sentence in 10(D) contains all of the essential terms of a contract, i.e., if a 17.5% cost increase was met, negotiations over the cost would result.  Id. at 18.

### C.    Ambiguity and Parol Evidence

PTI argues the Court should look at parol evidence to determine the true intent of the parties.  However, the plain language in the last sentence of section 10(D) states that if one of the triggering events in section 10(D) occurred, the parties agreed "to negotiate in good faith concerning such modification" to the Agreement.  Although PTI asserts the parties intended the last sentence in 10(D) to protect PTI from the increasing costs of insurance and, specifically, intended it to mean the parties would negotiate over costs and CSX would reimburse PTI some amount of money, the plain language of this section does not say as much.

Even assuming, *arguendo*, PTI's renewal premium did increase by at least 17.5% over the premium for the immediately preceding policy term, the language in section 10(D) does not require CSX to reimburse PTI for the increased costs of the insurance.  PTI essentially admitted this during the hearing.  After the Court inquired why the parties did not draft the Agreement to state that CSX would agree to pay all

-10-

or a portion of insurance costs above the costs for the base year in the event the renewal premium increased above 17.5%, PTI's counsel responded by stating the Agreement does not represent the parties' intent and is thus, ambiguous.  The plain language of the Agreement, however, unambiguously states the parties agreed only to negotiate in good faith to modify the Agreement -- they did not agree that CSX would reimburse PTI for increased insurance costs.  This much is clear.

Because the plain language of the Agreement is unambiguous with respect to what the parties agreed to do, it is improper for the Court to consider parol evidence. Siedle, 248 F. Supp. 2d at 1144.  Admittedly, if the Court were to determine there was ambiguity in what the parties agreed to do once a triggering event occurred under section 10(D), thereby allowing the Court to consider parol evidence, the email from Shelley Mast might be sufficient to preclude summary judgment.  This email suggests CSX intended to reimburse PTI for costs above the 17.5% up to an unspecified percentage.  However, the parties -- two sophisticated business entities -- agreed to the language set forth in the Agreement and such language does not require CSX to reimburse PTI for insurance costs PTI incurred.  The Court cannot consider parol evidence which varies the plain language in the Agreement.

### D.    Enforceability of the Agreement

Because the Court finds the parties unambiguously agreed only to negotiate in good faith, the next issue is whether such an agreement is enforceable.

-11-

### i.    Section 10(D) is an Agreement to Agree

CSX argues the agreement to negotiate in good faith over modification of the Agreement is nothing more than an agreement to agree -- an agreement which is unenforceable.  (Doc. 36, pp. 17-18).  PTI argues the parties intended this provision to mean something, and thus, it should be enforced.  (Doc. 39, p. 20).

Even when section 10(D) is considered with the Agreement as a whole, the Court cannot construe this section to mean anything more than the parties agreed to negotiate regarding some sort of modification to the Agreement.  As both parties concede, such modification could be anything.[10]  For instance, it could mean the parties would agree that PTI could maintain insurance for a lesser amount or that CSX would agree to pay claims other than stationary claims based on comparative fault.  The list could go on and on.  In fact, it could also mean that the parties may negotiate in good faith and decide not to modify any part of the Agreement.

It is clear that an essential term of section 10(D) of the Agreement, i.e., the term which binds the party to some end result, was left open.  Because an essential term

---

[10]   At the hearing, PTI's counsel stated "had [CSX] negotiated in good faith, it could have involved a reimbursement, it could have involved a contract extension or any number of other [possibilities]."  Moreover, CSX's counsel stated that PTI's 30(b)(6) witness identified three or four possibilities of how the Agreement could have been modified.  Specifically, CSX' counsel stated:
> it could go all the way from one extreme, . . . pay PTI the $4 million it seeks for its extra insurance costs.  It could . . . go all the way down to nothing where no modification may be warranted because there's no guarantee in that language . . . that the outcome results in any modification of the agreement at all.

of the Agreement was left open, the Court could not fashion a remedy in the event it determined either party breached this provision in the Agreement.   Dept. of Corrections v. C&W Food Serv. Inc., 765 So. 2d 728, 730 (Fla. 1st DCA 2000).  As CSX correctly states, "there is no remedy for the breach of a promise to negotiate modifications to the Agreement because there is no way to determine whether the parties would have reached an agreement had they negotiated."  (Doc. 36, p. 17).

Here, the agreement to agree concerns a specific provision in section 10(D) of the Agreement.  The Court finds the case of John Alden Life Ins. Co. v. Benefits Mgmt. Assoc. particularly apposite to this case.  675 So. 2d 188 (Fla. 3d DCA 1996). In John Alden, the parties entered into an employment contract and the contract contained a provision which stated the parties would negotiate a bonus in the future. Id. at 189.  The employee was never awarded a bonus and he sued in an effort to obtain one.  Id.  The trial court granted partial summary judgment for the employee, finding the bonus contractual provision enforceable.  Id.  The appellate court reversed stating "the contractual provision was merely an 'agreement to agree' in the future about the bonus and hence, unenforceable as a matter of law."  Id.  Accordingly, the court found summary judgment should be entered for the employer.  Id.

A number of other Florida[11] cases demonstrate that "where the essential terms of an agreement remain open, subject to future negotiation, there can be no

_____

[11]   Florida law applies in this case because the Agreement states it is governed by, and construed in accordance with, the laws of the State of Florida.  See Section 21(G) of the Agreement.  (Doc. 24-3, p. 18).

enforceable contract." Suggs v. DeFranco's, Inc., 626 So. 2d 1100, 1101 (Fla. 1st DCA 1993) (citing Central Prop., Inc. v. Robbinson, 450 So. 2d 277 (Fla. 1st DCA 1984), *modified on other grounds,* 468 So. 2d 986 (Fla. 1985); see also, Irby v. Memorial Healthcare Group Inc., 901 So. 2d 305, 306 (Fla. 1st DCA 2005) ("While it is not necessary that all details of an agreement be fixed in order to have a binding agreement between parties, if there has been no agreement as to essential terms, an enforceable contract does not exist."); Dows v. Nike, Inc., 846 So. 2d 595, 602 (Fla. 4th DCA 2003) (quoting Suggs, 626 So. 2d at 1101); C&W Food Serv., 765 So. 2d at 729 (stating that an agreement to negotiate terms of a contract is an unenforceable agreement to agree).[12]

While PTI cites several cases to support its contention that section 10(D) is enforceable, each of these cases are distinguishable as they base their holding that a contract is enforceable on the fact that the essential terms of the contract were present. See e.g., Sav-A-Stop, Inc. v. Jaydon, Inc. 124 B.R. 356, 359 (Bankr. M.D.

---

[12] Several of the cases where courts have found agreements to agree unenforceable are factually distinguishable from the instant case in that in such cases the courts found there was no enforceable contract because the parties had intended to take further action prior to entering into a contract. See e.g., Browning v. Peyton, 918 F.2d 1516, 1521 (11th Cir. 1990) (applying Florida law) (finding no agreement existed because the parties had "agreed to enter into discussions and negotiations" over whether to enter into a joint venture); Dows, 846 So. 2d at 602 (finding a written document evidenced the parties' agreement to agree, but also showed the parties' intent to take further action prior to completing a binding agreement).  Here, the section 10(D) agreement to agree is one small provision of an otherwise binding agreement.  Nevertheless, as in John Alden, the same principle of law regarding the unenforceability of "agreements to agree" still applies. 675 So.2d at 189.

Fla. 1991) (finding a settlement agreement enforceable because it set forth all material and essential terms of the settlement); <u>Peninsula Int'l Corp. v. Citizens and S. Int'l Bank</u>, 19 B.R. 762, 764 (Bankr. S.D. Fla. 1982) (finding agreement that stated all essential terms enforceable); <u>Robbie v. City of Miami</u>, 469 So. 2d 1384, 1385-86 (Fla. 1985) (affirming trial court's order enforcing the contract because all essential terms were present); <u>Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.</u>, 302 So. 2d 404, 409 (Fla. 1974) (finding agreement contained reasonably certain terms for specific performance); <u>Leopold v. Kimball Hill Homes Florida, Inc.</u>, 842 So. 2d 133, 138 (Fla. 4th DCA 2003) ("Since the parties did have a meeting of the minds on the essential terms of the contract, the contract was a valid, enforceable contract. . . ."); <u>Don L. Tullis & Assoc., Inc. v. Benge</u>, 473 So. 2d 1384, 1386 (Fla. 1st DCA 1985) (affirming trial court's decision that an undefined term in the agreement was not essential and was sufficiently specific to give it a definition); <u>Innkeeper Int'l v. McCoy Motels, Ltd.</u>, 324 So. 2d 676, 677-78 (Fla. 4th DCA 1976) (holding contract enforceable because although the date of commencement for the contract was left open, it was a nonessential element of the contract and the court could fill in the blank).

In direct contrast to the cases PTI cites, section 10(D) of the Agreement is missing essential terms. "As a general rule, [the] presence of blanks in a contract is fatal to the enforcement if the blanks occur in a provision dealing with an essential term of the contract." <u>Innkeeper</u>, 324 So. 2d at 678. There is no doubt that the terms

the parties left open for negotiation are essential terms because it would be impossible for the Court to enforce the contested 10(D) provision even if the Court determined CSX breached the Agreement; it is not specific enough in its terms to be capable of implementation.   Robbie, 469 So. 2d at 1385.   Even assuming PTI's premiums increased by 17.5%, it is not clear what the parties agreed to do other than negotiate regarding some unspecified modification(s) to the Agreement; this leaves an infinite number of possibilities open.

### ii.   PTI Has No Remedy

CSX  argues there is no remedy for the breach of a promise to negotiate an agreement.  (Doc. 36, p. 19).  PTI, on the other hand, has filed various documents purporting to show its damages.  For instance, in its Counterclaim PTI requested compensatory damages of at least $3,723,360.  (Doc. 24, p. 14).  It is unclear, however, how PTI assessed this amount.  A letter from Acordia/CNA, PTI's insurance broker, notifying PTI of its total increase in insurance premiums for the policy years dated April 1, 2001 - April 1, 2002, and April 1, 2002 -April 1, 2003 calculates the total premiums at $3,004,593 and $4,115,976, respectively.  (Doc. 36-3, p. 3).  PTI, however, submitted a damage calculation to CSX which shows its damages as $3,954,436.  (Doc. 36-4, p. 2).  This calculation uses amounts which differ from those set forth in the Acordia/CNA letter.  As such, the Court finds it difficult to follow PTI's calculations.  Nevertheless, it appears PTI seeks the entire amount of increase in insurance costs for a two year period over the total costs from the year it perceives

to be the base year; thus, PTI made no attempt to credit the 17.5% trigger amount when calculating its damages.

While PTI does not cite any specific authority which supports its requested remedy, it does rely upon caselaw for the proposition that courts "will not frustrate the intent of the parties who have concluded a transaction pursuant to the terms of an agreement even though the court may have to choose among conflicting interpretations or fill in some gaps left by the parties." (Doc. 39, p. 16) (quoting Peninsula Int'l Corp., 19 B.R. at 764). Thus, PTI argues because the parties intended for section 10(D) to be enforceable, the Court should enforce it.

However, section 10(D) contains too much calculated indefiniteness to make it enforceable; there is no "reasonably certain basis" for awarding a specific amount of damages. Cf. Blackhawk, 302 So. 2d at 408 (stating contract should be enforceable if the parties intended it to be and if there is a *reasonably certain basis* for giving an appropriate remedy) (emphasis added). In fact, there is no basis whatsoever in the Agreement for the damages PTI seeks.[13] Assuming, *arguendo,* that this Court found section 10(D) enforceable and further found CSX breached the agreement to negotiate in good faith,[14] the Court still "could not afford a remedy for

---

[13]   That the remedy PTI seeks is inappropriate is demonstrated by the fact that it demands the entire amount of its insurance costs.  No attempt is made to take into account the 17.5% "trigger" or to allocate or split the increased costs between PTI and CSX.  The reason for this is simple -- the Agreement provides no guidance on this critical point.

[14]   While the Court need not decide whether CSX breached the requirement to negotiate in good faith, it does note that CSX discussed PTI's claim for over a year

the breach of a promise to negotiate . . ., because there could be no way to determine whether the parties would have reached an agreement had they negotiated." <u>C&W Food Serv.</u>, 765 So. 2d at 730.  Any damages for breach of the agreement to negotiate in good faith are unquantifiable.

Because the Court finds section 10(D) of the Agreement unenforceable and any purported damages unquantifiable, the Court need not go further.  For example, the parties dispute whether the terms "renewal premium" and "immediately preceding policy term" are ambiguous; however, even if this Court found such terms ambiguous, section 10(D) of the Contract remains unenforceable.

## IV.   CONCLUSION

For the foregoing reasons, summary judgment is appropriate for CSX on its Complaint for Declaratory Judgment and on PTI's Counterclaim.

Accordingly, it is hereby **ORDERED**:

CSX Transportation, Inc.'s Motion for Summary Judgment (Doc. 36) is **GRANTED**.  CSX Transportation, Inc.'s Motion to Dismiss Counterclaim (Doc. 25) is **DENIED as moot.**  The Clerk will enter judgment in favor of CSX Transportation, Inc. and against Professional Transportation, Inc. on both the Complaint and Counterclaim and close the file.

---

and participated in a voluntary mediation.  These actions show at least some support for the premise that CSX did negotiate in good faith.

**DONE AND ORDERED** at Jacksonville, Florida this 13th day of November, 2006.

TIMOTHY J. CORRIGAN
United States District Judge

Copies to: counsel of record